Filed 11/25/20  P. v. Delossantos CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B298362 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA087721) |
| v. | |
| MARCELINO DELOSSANTOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Alan K. Schneider, Judge.  Affirmed.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Blythe J. Leszkay and David W. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Marcelino Delossantos (appellant) of first degree murder by torture. (Pen. Code, §§ 187, subd. (a), 189, subd. (a); *People v. Cole* (2004) 33 Cal.4th 1158, 1207.)[1] He admitted that he had a prior conviction for a violent or serious felony. (§§ 667, subd. (d) & 1170.12, subds. (a)-(d).) The trial court sentenced him to 25 years to life in state prison, and then doubled it to 50 years to life under the second strike sentencing provision of the "Three Strikes" law. (§§ 667, subds. (b)-(i) & 1170.12, subds. (a)-(d).) On appeal, appellant contends that there was insufficient evidence of murder by torture and therefore the trial court erred when it instructed the jury that it could convict appellant on a murder by torture theory. Also, he contends that the trial court erred when it denied his motion pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*) to strike his prior serious felony conviction. We find no error and affirm the judgment.

## FACTS

**Prosecution Evidence**

*Months and Days Leading Up to Appellant's Arrest*

Appellant lived behind his uncle's house in a storage container. For about six or seven months, Macelina Wright Vallecillo (Wright)[2] lived there, too. On January 12, 2018, Wright told her brother that she had a fight with appellant and he broke her nose. In the afternoon of January 27, 2018, one of the uncle's workers heard someone say, "Where are you going?"

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    At trial, and in the parties' briefs, Wright is referred to as "Macy Wright" and "Wright."

He saw Wright step out of the container while "almost" naked below the waist. The worker then saw appellant pull Wright back inside. The next day, the worker was present around 3:30 p.m. and heard a scream. Wright laughed as she emerged "full of straw" from an area where the uncle kept animals. At about 5:00 p.m., the uncle heard appellant and Wright arguing.

On January 29, 2018, the uncle went to see his animals around 7:00 a.m. and saw appellant exit the container and leave the property. Appellant went to a liquor store and bought Squirt and a bottle of tequila. The uncle saw appellant again at about 8:00 a.m. or 8:30 a.m.

At about 10:00 a.m., the uncle encountered appellant and believed he was drunk. He said something like, "I killed her," or "she killed herself." The uncle asked why appellant had "done that." He said Wright "had gone crazy and that she had taken off all her clothes, and she was jumping on the bed and she was going to head out and then he pushed her . . . , and then she bumped her head on the corner of the bed." When the uncle asked why he had not called the police, appellant said he could not call because he had hit her. He went into the container, came out and left.

The uncle called a family member and told him what happened. The family member called the police.

*The Police Discover Wright's Body and Collect Evidence from the Scene*

Police officers arrived and went to the storage container. To get inside, they had to cut off string or wire that was tied to the handles. They found Wright lying on a makeshift bed[3]

---

[3]  In the record, the bed is sometimes referred to as a couch.

covered with a blanket. She was cold to the touch and not breathing. Rigor mortis had set in "[s]omewhat." Her body was bloated. Per protocol, one of the officers called an ambulance.

Wright was pronounced dead at 11:20 a.m. She could have been dead for a couple of days. However, there were no signs of decomposition, which indicated that she died close to the time that she was found.

A homicide detective responded to the scene. He found jeans near Wright's body and noticed that they were surrounded by blood. The bed and walls had blood stains. The detective observed what appeared to be fecal matter on the bed as well as on Wright's body. Her lower back, side and shoulder bore injuries that looked like they could have been inflicted by a belt or strap. Outside the container, he observed a brown leather belt on a table. The detective swabbed various items and booked them into evidence.

*Appellant's Police Interview*

Appellant was arrested and interviewed by a detective the same day that Wright's body was found.

When asked where he was living, appellant said he did not have a "set place" but that he got his mail at the uncle's property. The detective asked why appellant thought he was being interviewed, and he said he did not know. He explained that he had been outside a liquor store for a couple of hours trying to pick up work as a day laborer. Before that, he was under some bushes sleeping. He said that he slept under those bushes all night.

The detective asked appellant what happened the night before. He said, "Nothing happened. To me, nothing. I was just wasted, you know, on [marijuana]." When asked if he slept in the storage container the prior night, he said, "There's no storage

4

container.  Like, I don't know what you're talking about."  He denied having a girlfriend.  Based on his version of events, appellant had not stayed at his uncle's house for three or four days.

The detective indicated that people saw appellant at his uncle's property that morning.  Appellant replied, "[Today]?  I mean, they probably did, but I didn't go inside."  He explained that he went to his uncle's property to see if someone needed him to work.

When asked about Wright, appellant said, "[Wright] was my girlfriend."  He explained that she had been upset because he smoked marijuana.  She wanted him to change, yet she was "doing like, meth."  The detective began a colloquy about Wright, and appellant said that "she left . . . with some Black guy."  He admitted that Wright and he had stayed at the uncle's house together.  He then said "she cut me loose" two days ago "[l]ike:  'I was not worth it.'"  This made appellant feel like "s**t."  He added, "You feel . . . you ain't worth . . . nothing."

Appellant said he loved her "[a] lot" and pointed out a tattoo with her name.  He admitted she stayed in the container with him "sometimes" but said she preferred being with a Black guy.  The detective said it was "tough," and appellant said, "Yeah, like I said, she[] . . . prefer[s] that Black guy [rather] than me, . . . I got out of control.  . . . 'Cause she was staying with me . . . [going] on [three] years."

When appellant said he had not spoken to Wright in two or three days, the detective said that swabs of appellant's hands revealed the presence of blood, and that Wright deserved to have appellant tell the truth.

5

Appellant said, "Okay. Okay, if you guys wan[t] [to] know[.] Yes, I did it." Then he said, "I didn't hit her[.]" He explained, "I just told her I didn't want nothing to do with her, 'cause that woman's [Black guy] . . . was around. That was it." The detective asked if they got into an argument, and appellant replied, "I only think I . . . pushed her." A few moments later, he said, "You know how they—like a Black guy, that's how they went, 'wa, wa, wa, wa.' I'm a Mexican, that gets on . . . my nerves when someone, like a Black guy or all that . . . yap, yap, yap, yap, gets on my nerves. But . . . like I said, I did push her and I left, that was it."[4]

When asked about when he went to the container that morning, appellant said it was early and he argued with Wright. He pushed her. She said he was "not much of a man" and that he was a "f***king f***got." He pushed her and gave her a backhand slap. He said he was "mad as a mother***ker." She said, "[T]he Black guy's better than you, mother***ker. You're not worth f***king . . . s**t, all this and that."

The detective asked if appellant told anyone. He said, "I ain't tell nobody I killed [Wright], none of that crap. I didn't even know if I killed her or not." The detective said, "But you did. How does that make you feel?" Appellant replied, "Dumb." He explained, ". . . I didn't think . . . I was [going to] kill her with a slap."

The detective inquired whether appellant was holding anything when he hit Wright, and he said, "No, I was just mad[.]" The detective said, "I don't know if she knocked out but she

---

[4] Appellant sometimes used a racial slur when referring to Wright's new boyfriend. We need not repeat that slur.

stopped talking right away, right when you hit her." Appellant replied, "Right away." The detective said, "And then you heard a thump." Appellant said, "Right," and that he started walking away.

The detective asked why Wright was on the bed. Appellant said, "I dressed her," and "I put them shorts on her[.]" The detective asked if appellant put her on the bed, he said, "No, I left her sitting . . . 'cause when I hit her [¶] . . . [¶] I walked to the front[.]" At first he thought she was knocked out, but then she yelled at him, and he walked back to her. Per appellant, "[T]hen I see[n] that she was bleeding from her [¶] . . . [¶] mouth." She yelled, "See what you did[?]" At that point, she went outside without any clothes on. Appellant explained that he tried to cover her. Then he grabbed her hair, threw her inside and pushed her on the bed. He threw a blanket on top of her and pushed her. Appellant said, "She went like" and knocked on the table to create a sound for the detective to hear. Next, appellant said, "[S]he fell . . . like it was at the end of the bed." It was at that point that appellant left.

Toward the end of the interview, appellant said, "Just do what you guys gotta do. Put me away, whatever," and "Give me the death penalty if you want." He added, "I never wanted to hurt her." Appellant believed he had blood on him because he slapped Wright.

*DNA Evidence*

A criminalist analyzed blood samples from appellant's hands, pants, and shirt. The sample from the pants matched Wright's DNA profile. The sample from the shirt contained the DNA profiles of appellant and Wright. Finally, the sample from appellant's hand was consistent with two contributors, one male

and one female. With respect to the male, the sample was consistent with appellant's DNA profile. As for the female, while there was insufficient information for a match, it could have come from Wright.

The criminalist did not test either a leather belt or a belt buckle for DNA.

*Medical Testimony Regarding Wright's Injuries and Death*

<u>Dr. Yulai Wang</u>

Dr. Wang conducted an autopsy.

Wright had small hemorrhaging and petechia on her eyelid and hemorrhaging on her right eyeball that was consistent with strangulation. There was hemorrhaging in her left eyeball consistent with both strangulation and blunt force trauma. She had reddish areas on her neck, bleeding in the muscles connected to her larynx and neck, and a fracture of her thyroid cartilage consistent with strangulation. Dr. Wang concluded that Wright had been strangled but could not say whether strangulation caused her death.

Wright had significant blunt force trauma on her face comprised of contusions and abrasions. She exhibited contusions on her scalp consistent with blunt force trauma that were consistent with someone punching her in the head. Further, she exhibited multiple contusions and abrasions on her torso, back, shoulder, chest, hip, arms and legs. The contusions on her back displayed a pattern consistent with injury inflicted by a belt. Injuries to her buttocks, which were in a U-shaped pattern, "could be" consistent with trauma caused by a belt buckle. Wright had contusions and lacerations inside her mouth and contusions on her lip consistent with blunt force trauma. Finally,

8

Dr. Wang noted that Wright had a subdural hematoma and significant bleeding in her head.[5]

Dr. Wang opined that the cause of Wright's death was multiple traumatic injuries consisting of contusions on her head and the subdural hematoma in her head, with strangulation as a contributing factor.

On cross-examination, Dr. Wang was asked if damage to an area on the back of Wright's head came from one injury. He expressed no opinion as to whether it was one or multiple injuries. Next, he was asked if he could identify the number of traumas that caused the subdural hematoma. He stated, "I don't know the exact number, but there were multiple." As for an injury to the left back side of Wright's head, Dr. Wang agreed that it could have been caused by Wright falling and hitting her head. He pointed out, however, that she had traumas to the front left side of her head as well as the right side. Each of those was a separate injury.

Dr. Donald C. Boger

Dr. Boger, a radiologist, examined x-ray and CT scan images of Wright's head and neck. He found significant soft tissue swelling of the left scalp extending into the left face, intracranial extravascular blood around different portions of the brain consistent with subdural hematoma, a fracture on the side of the larynx or airway, and a fracture of thyroid cartilage in the neck. Bleeding on the brain was most likely caused by the veins being ruptured by traumatic force. Dr. Boger was unable to

_____

[5]	Dr. Yang opined that some contusions on Wright's legs and abrasions on her left hand appeared to be older because they were healing.

9

determine whether bleeding on the left side of the brain was caused by one or multiple blows.

### Dr. Bill Smock

Dr. Smock, an emergency room physician, testified as an expert on strangulation.

Strangulation is the application of external pressure to a person's neck, which can block air flow, blood flow or both depending on how the pressure is applied. A victim will be rendered unconscious within five to 10 seconds if he or she is strangled and blood flow to the brain is blocked. The victim will go unconscious and the brain will stop working. After about 11 to 17 seconds, the victim will suffer an anoxic seizure. At 30 seconds, the victim will lose control of his or her rectal sphincter. If pressure is maintained, a victim will die in 62 to 157 seconds.

When strangulation causes anoxia (lack of oxygen) or hypoxia (limited oxygen), brain damage occurs. The hippocampus is particularly sensitive to oxygen deprivation. If hypoxia is visible under a microscope following a victim's death, it means the victim survived for several hours after the initial strangulation.

A strangulation victim may suffer fractures to bones and cartilage in the neck as well as petechia hemorrhages, which are ruptures of capillaries usually seen in the eyes. Dr. Smock saw evidence of petechia hemorrhages in a photo of Wright's eyes.

### Dr. Cho Lwin

Dr. Lwin, a medical examiner who specialized in neuropathology, examined Wright's brain and found hemorrhages on the left side at multiple levels in her cranium. Consistent with strangulation, the hippocampus showed hypoxic changes to the neurons because of blood and oxygen being cut off.

**Defense Evidence**

Appellant testified in his defense. He explained that the day before Wright's body was found, he pushed her several times to get her into the container and then to get her onto the bed. He did this because she kept going outside without clothes on. At one point, she was on the bed and tried to get off from it, and appellant pushed her. She tried to get off a second time, and he slapped her with a backhand motion. Later, he went out to buy alcohol. He got back to the container at 8:00 p.m. or 9:00 p.m. Wright was on the bed and "had a little drop of blood." Appellant wiped it up. Then he jumped on the bed and smoked marijuana. She was not moving, and he decided to dress her in shorts and lay her on a pillow. He saw some blood underneath her left nostril. Eventually, he went to sleep next to her.

On cross-examination, appellant suggested that Wright got her injuries either from falling in the backyard or from his dogs. The prosecutor asked, "Are you telling me that the five dogs in your house beat up [Wright]?" He denied saying that.

After appellant again stated that he slapped Wright, the prosecutor asked, "And that one hit resulted in all those injuries to her body[,] is that right?" Appellant once again suggested she had fallen in the backyard. The prosecutor inquired if appellant whipped Wright with his belt. Appellant said he did not. Then the prosecutor asked if Wright strangled herself. Appellant replied, "I don't know." Next, the prosecutor asked, "Did [Wright] fracture the bone in her thyroid cartilage?" In response, appellant testified, "I never said that she did or I did . . . or what happened. She was falling everywhere, and when I pushed her, she hit on the bed and everything. I don't know if she hit herself on something on the ground or whatever on the neck."

Appellant testified that he woke up the next morning and tried to get close to Wright to warm up. She was cold, and that's when he discovered she was dead. He told his uncle to call the police.

When the prosecutor inquired about appellant's relationship with Wright, he admitted that she went back to her old boyfriend because she did not think appellant was worthy as a man. But appellant said that did not upset him. However, he got mad when she called him derogatory names, so he called her a derogatory name that expressed racist antipathy for her choice of a Black man.

## DISCUSSION

### I. Murder by Torture.

Appellant contends that there was insufficient evidence to support a murder by torture instruction and therefore the murder by torture conviction. Specifically, he contends there was insufficient evidence that he intended to inflict extreme and prolonged pain on Wright; that he did so for revenge, extortion, persuasion, or another sadistic purpose; that he did so willfully, deliberately, and with premeditation; and that any infliction of extreme and prolonged pain was the cause of Wright's death. As discussed below, we cannot agree.

A. *Relevant Proceedings*.

Toward the end of the trial, appellant's counsel argued that the murder by torture theory should not be presented to the jury because there was insufficient evidence of intent to cause cruel or extreme pain or suffering, and insufficient evidence that his purpose in acting was revenge, extortion, persuasion, or some other sadistic purpose. The trial court disagreed. It later instructed the jury as to first-degree murder by torture, first-

12

degree premeditated murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter. The jury convicted appellant of first-degree murder by torture.

B. *Relevant Law.*

In a criminal case, an instruction on a theory of guilt is appropriate if there is substantial evidence to support a conviction on that theory. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 408.)

When applying the substantial evidence test, we examine the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The same standard applies to when we review whether the evidence supports a special circumstance finding. (*People v. Edwards* (2013) 57 Cal.4th 658, 715 (*Edwards*).)

Murder perpetrated by means of torture is murder of the first degree. (§ 189, subd. (a).) Special circumstance murder by torture "requires (1) an act or acts causing death that involve a high degree of probability of death, (2) a causal relationship between the torturous act and death, (3) a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on a person for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose, and (4) commission of the act or acts with such intent. [Citations.]" (*Edwards, supra,* 57 Cal.4th at pp. 715–716.)

A finding of murder by torture ""encompasses the totality of brutal acts and the circumstances which led to the victim's death. [Citations.] The acts of torture may not be segregated into their constituent elements in order to determine whether any single act by itself caused the death; rather it is the

13

continuum of sadistic violence that constitutes the torture.'" [Citation.]" (*Edwards, supra*, 57 Cal.4th at p. 716.) "'The jury may infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the body.' [Citation.] A perpetrator need not have any intent to kill [citation], and it need not be proven that the victim actually suffered pain [citation]." (*Ibid.*)

"'[E]vidence that the defendant intentionally inflicted nonlethal wounds on the victim may demonstrate the requisite "'sadistic intent to cause the victim to suffer pain in addition to the pain of death."'" [Citation.] Such wounds support a finding of intent because they 'evidence deliberate and gratuitous violence beyond that which was necessary to kill the victim.'" (*People v. Powell* (2018) 5 Cal.5th 921, 945.) In contrast, courts must be cautious not to give undue weight to the severity of wounds. "Horrible wounds may be consistent with a killing in the heat of passion or an explosion of violence" (*People v. Chatman* (2006) 38 Cal.4th 344, 390) rather than an intent to inflict extreme and prolonged pain.

The concept of premeditation assumes preexisting thought and reflection rather than unconsidered or rash impulse. (See *People v. Lopez* (2018) 5 Cal.5th 339, 354–355 [discussing premeditated murder].)

C. *Analysis.*

Witness testimony and appellant's statements establish that appellant and Wright lived together in the container during the days before she was discovered, and that he was at the container the morning that she was discovered. Appellant's statements establish that: appellant is Mexican; appellant and Wright exchanged heated words in which she made belittling

14

comments, used a homophobic slur to describe him, and said that he was not worthy as a man; her words gave him negative feelings about himself; Wright expressed a preference for a Black man; Wright was leaving appellant for that Black man; appellant used a racial slur to refer to the Black man; appellant used an ugly term indicating he had antipathy for Wright due to her stated preference for a Black man; her words gave him negative feelings about himself; appellant and Wright got into a physical altercation in which he claimed he pushed her and gave her a backhand slap; she stopped talking when he hit her, and that she "knocked out;" appellant knew Wright was dead before the police were called because he told his uncle that appellant killed her or she killed herself; appellant said he did not call the police because he had hit Wright; appellant said he felt dumb for killing Wright; and appellant told the detective he never wanted to hurt Wright, and he did not object to being given the death penalty. In addition, appellant lied to the detective regarding his whereabouts and his relationship to Wright but then changed his story when he was presented with conflicting facts and admitted that Wright was his girlfriend and they were at the container. His statements exhibited motive to kill or torture Wright, and his lies exhibited consciousness of guilt.

The physical evidence regarding Wright's wounds and the expert opinions support the reasonable inferences that appellant did more than slap and push Wright. Rather, he beat, whipped and strangled her, causing brain damage, hematomas, abrasions, welts, contusions, tissue damage and broken cartilage. She sustained both nonlethal injuries to her face, torso, arms, legs and buttocks, and injuries to her head that were cumulatively lethal. The fecal matter on the bed proved she was strangled for

at least 30 seconds, the time necessary for her to lose control of her rectal sphincter. Wright's hippocampus showed visible signs of hypoxia, establishing that she lived for several hours after being strangled.

Based on the evidence that Wright suffered lethal and nonlethal blunt force trauma as well as strangulation, the jury justifiably concluded that appellant killed Wright. We must now determine whether it justifiably concluded that it was murder by torture.

The answer is yes.

The injuries to Wright's head and neck, coupled with the injuries to the rest of her body, establish that appellant engaged in a variety of attacks, and attacked different parts of Wright's body. The nature, variety and extent of Wright's injuries, and the fact that she lived for several hours after being strangled, provide sufficient evidence that appellant had time to reflect on his actions and acted with premeditation rather than heat of passion or an explosion of violence. Further, the variety of injuries and the duration of time that Wright might have been suffering after she was first strangled indicate that appellant intended to inflict extreme and prolonged pain. Also, the nonlethal abrasions and welts and contusions to her face, torso, arms, buttocks and legs were gratuitous, which bolsters the conclusion that appellant inflicted wounds on Wright with sadistic intent.

Appellant's statements to the detective in his police interview indicated he was angry at Wright because: she was leaving him, she made belittling comments, she expressed a preference for a man of another race, he bore racial antipathy for the man of another race, and he called her racially tinged names.

This evidence supported the reasonable inference that appellant tortured Wright for revenge.

Dr. Wang opined that the cause of Wright's death was multiple contusions on her head as well as the subdural hematoma in her head, and that strangulation was a contributing factor. This opinion supported the finding that torture was the cause of Wright's death. Dr. Wang was not required to determine which blow or blows caused Wright's death. As set forth in case law, "[t]he acts of torture may not be segregated into their constituent elements in order to determine whether any single act by itself caused the death[.]" (*Edwards, supra*, 57 Cal.4th at p. 716.) We are concerned only with the totality of brutal acts constituting the torture. (*Ibid*.)

Appellant offers a series of counterarguments.

First, he contends there is insufficient evidence to warrant the conclusion that he intended to inflict extreme and prolonged pain. He avers that the lack of eyewitness testimony to "establish the circumstances surrounding the infliction of Wright's wounds, such as the number of separate blows inflicted, or the amount of time during which blows or strangulation was being inflicted" renders the conviction infirm. We disagree. The nature and extent of the injuries, and the hypoxia present in Wright's hippocampus, established that Wright suffered numerous injuries while she was alive. The precise number of blows as well as the precise amount of time that the torture lasted were not necessary details. Based on the totality of circumstances, the jury was empowered to find the requisite intent. Thus, we reject the suggestion that the prosecutor was required to establish either a specified number of blows or that Wright was tortured for a specified length of time. Appellant

17

next contends that there was no evidence regarding his mental state to suggest the requisite intent.  We disagree.  The nature of Wright's injuries permitted the jury to infer his mental state and therefore his intent to inflict extreme and prolonged pain when he beat, whipped and strangled her.

Second, appellant suggests there was insufficient evidence that he intended to inflict extreme and prolonged pain for, inter alia, revenge.  Appellant seizes upon the lack of evidence that he followed a plan, and that he did not obtain or use any weapon except for perhaps the belt.  But acting pursuant to a plan and obtaining or using a weapon are not necessary to prove that the motive for torturing Wright was revenge.  Taking a different tack, appellant argues that his statements about the conversations he had with Wright suggest, at most, a motive to kill, not a motive to inflict extreme and prolonged pain.  We reject this suggestion.  While the conversations suggested either motive, appellant's use of nonlethal violence as well as the duration of time Wright lived after being strangled established that his intent was to torture, not kill.

Third, appellant argues that because there was no evidence that he acted pursuant to a plan, there was no evidence that he acted with premeditation.  But the law did not require that the prosecution prove that appellant had a plan.  It only had to show that he acted intentionally and deliberately, and the evidence amply showed that he did.

Fourth, appellant urges us to conclude that Dr. Wang's opinion on the cause of death did not prove that Wright died from being tortured.  This argument cannot prevail.  Nothing about the record was equivocal regarding Wright's injuries and Dr. Wang was qualified to render an opinion.  Appellant has

18

offered no legal authority permitting us to reject Dr. Wang's testimony. Appellant notes that Dr. Wang stated that one of Wright's head injuries could have been caused by a fall. This does not change our analysis. We examine torture as a continuum of brutal acts and do not parse the constituent acts. And, even if she fell and hit her head, the reasonable inference is that she fell because he hit or pushed her, and therefore any fall was part of the torture that he inflicted. Regardless, the cause of death was multiple head injuries, not one.

Because we have concluded that sufficient evidence supported the murder by torture conviction, we must conclude that the trial court had sufficient reason to instruct the jury on a murder by torture theory.

## II. *Romero.*

Appellant contends the trial court abused its discretion when it denied his *Romero* motion. We conclude otherwise.

A. Relevant Background.

In 1994, when appellant was 20 years old, he was convicted of gross vehicular manslaughter (§ 191.5, subd. (a)) and sentenced to six years in prison. He was released on parole, which he violated in 1999. In 1999, appellant was convicted of driving under the influence of alcohol (Veh. Code, § 23152) and sentenced to a five-year prison term.[6] In 2004, appellant was convicted of marijuana possession. Also, in 2004, he was convicted of driving under the influence (Veh. Code, § 23152) and received a four-year prison sentence. In 2015, he was convicted of public intoxication (§ 647, subd. (f)).

---

[6] In 2000, appellant was arrested for participating in a prison riot (§ 405).

B. <u>Relevant Proceedings</u>.

Appellant admitted a prior strike for gross vehicular manslaughter, which subjected him to an enhancement. (§§ 667, subds. (b)-(i) & 1170.12, subds. (a)-(d).) Also, he admitted he was driving while intoxicated, and that he caused a death. Later, he moved to strike the enhancement under *Romero*. The trial court denied the motion, stating, "Here is the problem. The crime here is very serious, and the other crime involved a death of another individual. So unfortunately, even though it is remote, the court would not be inclined to grant the *Romero* motion."

C. <u>Relevant Law</u>.

A trial court has discretion to strike a prior felony conviction in the furtherance of justice pursuant to section 1385, subdivision (a). (*Romero, supra,* 13 Cal.4th 497, 530.) When considering whether to grant a *Romero* motion, a trial court must consider the nature and circumstances of a defendant's present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, and then determine whether the defendant may be deemed outside the spirit of the Three Strikes law, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies. (*Romero, supra,* at p. 531.) A trial court's denial of a *Romero* motion must be affirmed unless we conclude there was an abuse of discretion. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 992–993.) We will not reverse unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1206.)

20

D. <u>Analysis</u>.

Appellant argues that his first strike should have been stricken because (1) it incurred a long time ago and the time lapse suggests that criminal activity is not a way of life for him, (2) there is no proof that he is a hardened recidivist criminal given that all his prior crimes related to alcohol; (3) nothing about the current offense suggests that he cannot be rehabilitated; and (4) he would receive a long sentence even without the enhancement.

We find no abuse of discretion.

Appellant's first strike involved a homicide that was the result of his decision to drive a vehicle while intoxicated. In the ensuing years, he committed two more felony violations of Vehicle Code section 23152, which showed a reprehensible disregard for human life. Then, he committed a murder by torture, a particularly heinous act. Thus, it was not arbitrary, capricious or patently absurd for the trial court to deny the motion, implicitly concluding that appellant was within the spirit of the Three Strikes law.

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST

We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT

22